UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR 16-00251 WHA |
| v. | |
| LAMAR JOHNSON, | **ORDER RE MOTION FOR COMPASSIONATE RELEASE** |
| Defendant. | |

In June 2016, an indictment charged defendant Lamar Johnson, a previously convicted felon, with the following: Felon in Possession of a Firearm (Count 1); Possession with Intent to Distribute Cocaine Base (Count 2); Possession with Intent to Distribute Hydrocodone (Count 3); Possession with Intent to Distribute Oxycodone (Count 4); Using, Carrying, and Possessing a Firearm in Connection with a Drug Trafficking Crime (Count 5); Felon in Possession of a Firearm (Count 6); Possession with Intent to Distribute Cocaine Base (Count 7); Possession with Intent to Distribute Alprazolam (Count 8); and Possession with Intent to Distribute Clonazepam (Count 9) based on incidents occurring on August 2015 and March 2016. Following a bench trial in February 2017, defendant was found guilty of Counts 1 through 7.

The August 2015 offense stemmed from a traffic stop by the East Palo Alto Police Department. Officers found defendant wearing a bulletproof vest. His car contained a loaded handgun and various illegal drugs. Defendant was carrying approximately $650 on him at the time.

The March 2016 incident stemmed from a search of defendant's residence and vehicle in which the East Palo Alto Police Department found a loaded firearm, ammunition, scales, and more illegal drugs.

In June 2017, defendant received a 94-month sentence, which was below our guidelines. He has now served approximately 49 months of this sentence and is currently housed in FCI Terminal Island. In July 2020, he moved for compassionate release, noting his medical conditions and the COVID-19 pandemic. A hearing ensued on August 5. The parties then submitted supplemental briefing and a further hearing ensued on August 19. The parties submitted additional supplemental briefing following that hearing.

Under 18 U.S.C. § 3582(c)(1)(A)(i), a district court may modify a term of imprisonment:

> upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier.

Defendant petitioned the warden for release at FCI Terminal Island on June 10, 2020. At least 30 days have passed and BOP has not granted the request, which means that this Court has the authority to rule on the underlying motion.

In determining whether to modify a term of imprisonment, we must consider the factors in Section 3553(a) and find that "extraordinary and compelling reasons warrant such a reduction," "and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

In turn, the relevant policy statement provides in part that extraordinary and compelling reasons exist when:

> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), endstage organ disease, and advanced dementia.
>
> (ii) The defendant is —
>
> > (I) suffering from a serious physical or medical condition,

>> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13 cmt. n.1. The policy statement also requires the court find defendant is not a danger to the safety of any other person or to the community.

Defendant is forty-six-years-old and suffers from, among other things, asthma, obesity, and neuropathy. Defendant argues that due to the pandemic, his medical conditions put him at a higher risk of contracting or suffering severe symptoms from COVID-19, which are further exacerbated by the allegedly rampant spread of the virus at FCI Terminal Island. Recognizing that there is still much to learn about the transmission, prevention, and nature of coronavirus itself, this order nevertheless assumes defendant's medical conditions present extraordinary and compelling reasons under the Sentencing Commission policies.

This order recognizes that months ago, Terminal Island suffered from a severe COVID-19 outbreak, resulting in over 600 of the 900+ inmate population testing positive for the virus. Ten inmates have died of COVID-19 thus far with the most recent occurring on June 21. More recently, things are much better. Currently, the facility only has three positive inmates and six positive staff. The record before us suggests that defendant himself remains healthy. Since the outbreak, Terminal Island has established procedures to stem the spread of the virus. Importantly, positive and/or symptomatic inmates are immediately placed in isolation. Symptomatic and positive staff are also required to isolate. Screening procedures are used to monitor inmates and staff as well (Prioleau Decl. ¶ 21, 35).

Defendant, nonetheless, notes a number of lapses in Terminal Island's COVID-19 procedures, pointing to, among other things, the fact that asymptomatic inmates and staff are not tested, the lag time between tests (between one to over three months), and that Terminal Island's COVID-19 data may not be accurate given the possibility of re-infection. These concerns are well-taken, especially the fact that staff are not tested for COVID-19. This order,

3

1   nonetheless, notes, that regular testing of asymptomatic individuals would require Terminal
2   Island to perform a nasal PCR swab of all 900+ inmates every few days.  Few facilities or
3   organizations, even among the general population (such as universities where students also
4   share communal spaces) have implemented such broad testing procedures.  What Terminal
5   Island has done, however, is regularly screen inmates, including defendant, and staff for
6   symptoms.

7   This order neither approves nor disapproves of the procedures that Terminal Island uses,
8   but recognizes that there are currently only nine active COVID-19 cases at the facility and that
9   over 600 of the facility's past or current inmates have already contracted COVID-19 and
10  seemingly recovered.  The high recovery rate combined with the steps taken to curb the
11  infection has at least lessened some of the risk that may have been present during the
12  infection's peak at the facility.  Regardless of Terminal Island's response to COVID-19, this
13  order still assumes that given the heightened risk to COVID-19 that certain respiratory diseases
14  can pose, defendant's medical conditions present extraordinary and compelling circumstances
15  under the Sentencing Commission policies.

16  The dispositive question, however, in determining whether to grant the motion for
17  compassionate release is danger to the community.  On its face, the nature of the underlying
18  crimes alone weighs toward a finding that defendant is a danger to the community.  Officers
19  found loaded firearms and illegal drugs during both of their searches.

20  Defendant has, however, provided some mitigating context as to the August 2015
21  offense.  █████████████████████████████████████████████
22  ███████████████████████████████████████████████████
23  ███████████████████████████████████████████████
24  ███████████████████████████████████████████████████
25  ███████████████████████████████████████████████████
26  █████████████████████████████████████████████████
27  ███████████████████████████████████████████████████
28  ███████████████████████████████████████████████

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬

The problem is that even with the context of the August 2015 offense in mind, defendant still poses a danger to the community. Defendant has had at least three encounters with loaded guns (the two in the instant case and another one in 1995 for carrying a loaded firearm in a public place, a conviction, by the way, that the self-protection story fails to explain away). He also has a history of dealing drugs, including two earlier convictions for selling marijuana. In the instant offense, officers found scales alongside hydrocodone, oxycodone, and cocaine base, as well as cash. The presentence report also states that during an interview with the East Palo Alto Police Department following the August 2015 offense, defendant stated that "hustling" (*i.e.* drug dealing) is all he knows and that "every time he is let out of jail, he will carry a gun for protection." In light of defendant's many convictions related to loaded firearms and hustling illegal drugs, this order finds that defendant poses a danger of recidivism should he be released. Yes, the defense says he won't do it again, but the record says otherwise. So does experience. Others have recently gotten out of prison based on COVID-19 only to reoffend shortly thereafter. *See, e.g., United States v. Ernest Fobbs,* Case No. CR 19-00410 WHA.

At first, the Court felt defendant's story about self-protection rang true. On reflection, however, even so, the circumstances calling for his self-protection remain in effect, at least in part. So, the incentives to carry a loaded gun remain in place. If his story is true, moreover, he will be safer in prison than in the Bay Area.

The Court thanks excellent counsel for their extra efforts to obtain supplemental information, all of which was considered.

The motion for compassionate release is **DENIED**.

**IT IS SO ORDERED.**

Dated: August 26, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

5